NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-91

COMMONWEALTH

vs.

EDWIN CASTRO.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After trial by a jury in the Superior Court, the defendant appeals from his convictions for offenses including home invasion, armed assault with intent to rob, and assault with intent to rape. The crimes occurred at an apartment across the street from the defendant's home and while he was subject to a home inclusion zone monitored by an ankle bracelet that generated global positioning system (GPS) data. He argues that the judge erred in admitting evidence both that he was subject to the home inclusion zone and of the GPS data showing his location at the time of the crimes. The defendant further contends that in closing argument the prosecutor impermissibly disparaged the defense theory, referred to facts not in

evidence, and improperly encouraged the jury to disregard certain GPS data points as "outliers."  We affirm.

Background.  On October 12, 2018, the victim was living in a first-floor apartment in a three-family building in Chelsea. That morning, the other residents of her apartment had left and she was home alone.

The defendant was living across the street from the victim in a home about 152 feet away from hers.  He was wearing a GPS ankle bracelet and was subject to a home inclusion zone.  When he was within the home inclusion zone, the GPS monitor depicted his location on a map as a green point, generated once every minute.  When the defendant left the home inclusion zone, the GPS monitor would generate his location every fifteen seconds, and would depict his location as a yellow point as long as he had been outside the inclusion zone for fewer than ten minutes. When the defendant had been outside the inclusion zone for longer than ten minutes, the GPS monitor would depict his location as a red point, again generated every fifteen seconds. If the device returned to the inclusion zone, the point turned green again.  Shortly before 7 A.M., the defendant's GPS data recorded his location as moving from the green zone into the yellow zone and then into the red zone.

2

Shortly after 7 A.M., someone knocked on the victim's apartment door. After the victim asked who it was, a man's voice said in Spanish, "I am the young man from upstairs." The victim opened the door and saw a man in dark clothes holding a knife. Though the man was wearing a mask, his black facial hair, including a mustache, was visible. He had a stocky build and was taller than the victim, who was about five feet, three inches tall. He was not wearing gloves. The victim tried to shut the door, but the man forced his way inside, grabbed her from behind, and held the knife to her throat.

At 7:02:38 A.M., the defendant's GPS data showed, with an estimated accuracy range of twenty-six feet, that he was inside the victim's apartment building. Based on that and other evidence, including DNA, the jury could infer that the defendant was the attacker.

The defendant spoke to the victim in Spanish. The victim, who was born in El Salvador, recognized his accent as that of someone from either El Salvador or Honduras. The defendant ordered the victim not to move or scream, but she began screaming immediately. The defendant pulled the victim into the bedroom, demanding, "Where is the money?" He pushed the victim onto the bed and said, "If you don't tell me where the money is, I will abuse you." The defendant put his hand into the victim's

3

pants, inside her underwear, and touched her vaginal opening. During the sexual assault, the defendant said, "Don't look at my face, you could recognize me."  The victim kept screaming and tried to push the defendant away.  The defendant said that if the victim did not stop screaming, he would tie her up, and reached to a laundry hamper to get something with which to bind her.

Just then, the victim escaped the defendant's grasp and ran from the bedroom to the front of the apartment.  The defendant ran after her and grabbed her shirtsleeve, tearing it. Subsequent testing on the tear revealed deoxyribonucleic acid (DNA) that matched the defendant's.[1]  After the victim kept screaming, the defendant ran out of the building.

Meanwhile, an upstairs neighbor heard the victim screaming "Stop!" in Spanish and called the police.  When police arrived, the door leading from the hallway to the basement was ajar.

About three weeks later, police located the defendant at his home.  The defendant is from El Salvador and has a stocky build and black facial hair.  Police obtained security video footage from cameras at the two intersections one block in either direction from the victim's and the defendant's homes,

---

[1] The defendant's DNA profile would be expected to be found in one in 529.9 octillion unrelated individuals.

4

but neither video depicted anyone matching the attacker's description leaving the area during the time-frame between the neighbor's call to police and their arrival at the victim's home.

After trial, the jury convicted the defendant of home invasion, G. L. c. 265, § 18C; armed assault with intent to rob, G. L. c. 265, § 18 (b); indecent assault and battery, G. L. c. 265, § 13H; assault with intent to rape, G. L. c. 265, § 24; and assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (b).[2]  The defendant appeals.

Discussion.  1.  Evidentiary rulings.  "We review evidentiary rulings for abuse of discretion."  Commonwealth v. Denton, 477 Mass. 248, 250 (2017).  See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  "In weighing the probative value of evidence against any prejudicial effect it might have on a jury, we afford trial judges great latitude and discretion, and we uphold a judge's decision in this area unless it is

---

[2] In addition to these convictions for offenses that occurred on October 12, 2018, the defendant was indicted for breaking and entering in the daytime with intent to commit a felony, G. L. c. 266, § 18, arising from an incident on November 2, 2018, at a building of a different victim.  After trial, the defendant pleaded guilty to that offense.  He makes no argument with respect to that conviction.

5

palpably wrong." Commonwealth v. Sicari, 434 Mass. 732, 752 (2001), cert. denied, 534 U.S. 1142 (2002).

a. Home inclusion zone. The defendant argues that the judge erred in admitting evidence that the conditions of the defendant's GPS monitoring required that he remain within the home inclusion zone. He contends that the requirement was the equivalent of prior bad act evidence, and therefore we should review its admissibility not to determine if its probative value was "substantially outweighed" by its prejudicial effect, as for other evidence, but rather merely "outweighed" by that prejudicial effect. See Commonwealth v. Crayton, 470 Mass. 228, 249 n.27 (2014). See also Mass. G. Evid. §§ 403, 404 (2026).

Before trial, the judge weighed the probative value of the evidence that the defendant was required to remain within the home inclusion zone against its prejudicial impact. The judge noted that the evidence that the defendant was required to remain in his home increased the likelihood that if he committed a crime he would do so nearby, to avoid tripping an alert to probation. Conversely, if the jury knew the reason for imposition of home confinement, that information could be unduly prejudicial, and thus the judge cautioned the prosecutor to "stay away" from that issue. After defense counsel argued that the term "home confinement" was itself unduly prejudicial, the

prosecutor agreed to use the term "home inclusion zone" instead. The judge concluded that the probative value of the evidence outweighed its prejudicial impact.

The defendant's probation officer testified that, as of October 12, 2018, the defendant was wearing a GPS bracelet. When the prosecutor asked if the defendant's electronic monitoring included "a home inclusion zone," the probation officer replied, "Yes, he was placed on home confinement." The defendant did not object, but the judge interjected, "Let's just answer yes or no, if you can." The jury heard no evidence of what the defendant had been accused or convicted of doing that led to that requirement. After the probation officer's testimony, the judge cautioned the jurors that they should not speculate on why the defendant was subject to GPS monitoring, and could not use that evidence to conclude that he had bad character or was more likely to have committed these crimes. The judge repeated those cautions in her final charge.

In those circumstances, we doubt that the evidence amounted to prior bad act evidence, but, even if it did, the judge's limiting instructions sufficiently circumscribed the jury's use of the evidence. The jury are presumed to have followed the judge's instructions "to disregard matters withdrawn from their consideration" (citation omitted). Commonwealth v. Helfant, 398

Mass. 214, 228-229 (1986).  We discern no abuse of discretion in the judge's conclusion that the probative value of the evidence that the defendant was subject to a home inclusion zone outweighed any prejudicial impact.  See Commonwealth v. Walker, 460 Mass. 590, 613 (2011) (no abuse of discretion finding probative value of testimony about drug dealing was relevant to defendant's motive outweighed prejudice, and strengthened by forceful limiting instructions).  Contrast Commonwealth v. Anestal, 463 Mass. 655, 666 (2012) (details of child welfare complaint against defendant inadmissible as more prejudicial than probative).

b.  Location data.  The defendant argues that the GPS evidence from the ankle bracelet should not have been admitted because it was not reliable and it was more prejudicial than probative.

Before trial, the judge held a voir dire of Scott Calcagni, the account manager for Attenti Electronic Monitoring, which provides GPS monitoring equipment and services to the department of probation.  Based on Calcagni's voir dire testimony, which included an explanation about how multiple satellites are used to generate data points, and that ninety-five percent of data points are accurate to within about thirty feet, the judge ruled that the Commonwealth had laid an adequate foundation that the

GPS data showed the location of the defendant's electronic monitor at a given time. However, the judge ruled that the Commonwealth could not introduce GPS data to calculate the defendant's speed, citing Commonwealth v. Davis, 487 Mass. 448, 456 (2021), S.C., 491 Mass. 1011 (2023).

On appeal, the defendant argues that because the victim's apartment was only 152 feet away from the defendant's home, and Calcagni testified that in Massachusetts the "default" distance for a home inclusion zone is 150 feet and the margin of error for certain data points was as much as 141 feet, in these circumstances the GPS data were too imprecise to be admissible and the judge abused her discretion in admitting them. We are unpersuaded.

GPS technology "is widely used and acknowledged as a reliable relator of time and location data." Commonwealth v. Thissell, 457 Mass. 191, 198 (2010). Here, based on the testimony of the probation officer that the defendant was subject to GPS monitoring and the testimony of Calcagni about how the monitoring worked, the Commonwealth laid a sufficient foundation for the judge to "make a principled decision as to [the GPS records'] trustworthiness and reliability." Id. We conclude that the judge acted within her discretion in finding that the GPS data as to the locations of the electronic monitor

at certain times were substantially trustworthy and demonstrably reliable.

2.  Closing argument.  The defendant contends that several aspects of the prosecutor's closing argument were improper.  As the defendant did not object to the prosecutor's remarks at trial, we review to determine if there was error, and if so, whether it created a substantial risk of a miscarriage of justice.  See Commonwealth v. Holguin, 101 Mass. App. Ct. 337, 341 (2022).  We find no error.

A prosecutor may argue "forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence."  Commonwealth v. Kozec, 399 Mass. 514, 516 (1987).  To determine whether an improper argument was made, the prosecutor's remarks are "considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury" (citation omitted).  Commonwealth v. Nelson, 468 Mass. 1, 10 (2014).

First, the defendant argues that the prosecutor impermissibly disparaged the defense by referring to defense counsel's argument as talking about a "hypothetical world."  The prosecutor argued that defense counsel

> "spent most of the last [twenty] minutes talking about the hypothetical world and the speculative world and part of the instruction from [the judge] is going to be that you base your decision on the evidence and not on speculation.

10

There is . . . the hypothetical world and then there is the real[] world you heard about in the courtroom."

The prosecutor later specifically critiqued "[t]he hypothetical world where maybe [the defendant's] DNA mysteriously got on that shirt some other way," directly rebutting a part of the defense counsel's closing argument.

It is improper for a prosecutor to argue that the "whole defense" is a "sham," but a prosecutor may address a particular point in the defense counsel's closing argument as a sham. Commonwealth v. Lewis, 465 Mass. 119, 130 (2013), quoting Commonwealth v. McCravy, 430 Mass. 758, 764 (2000). We read the prosecutor's comments as permissible exhortations for the jury to base its findings on the evidence, and not as any disparagement of the entire defense.

Next, the defendant contends that the prosecutor injected racial or ethnic bias into his closing by arguing, "Do you think it's an accident that he chose a victim who lived in that house 152 feet away, a house with fellow Salvador[]an Americans or Salvador[]ans[?]" The victim testified that she was from El Salvador, and she recognized the defendant's accent in Spanish as being from either El Salvador or Honduras. In that context, the references to the national origin of the victim and the defendant were based in the evidence and relevant to issues including his identification and her ability to understand his

11

statements during the crimes.  Cf. Commonwealth v. Ahern, 96 Mass. App. Ct. 197, 199 n.3 (2019) (after bartender described defendant's leaving bar abruptly as "Irish exit," prosecutor's repetition of phrase in closing was based in evidence and not prejudicial).  The prosecutor's comment came in a discussion of the defendant's opportunity to watch the routines of the victim and other residents of the apartment in order to time his attack.  Additionally, the prosecutor's references to the national origin of the defendant and the victim did not appeal to harmful stereotypes or ethnic prejudice.  Contrast Commonwealth v. Graziano, 368 Mass. 325, 331-332 (1975) (multiple references to novel and motion picture "The Godfather" impermissibly appealed to ethnic stereotypes).

Finally, the defendant argues that the prosecutor impermissibly told the jury to "discard" outliers among the GPS data points.  While summarizing the GPS evidence, the prosecutor argued,

> "What is [the defendant] doing and where is he during a couple of those times that the points are not as accurate because the signal is not as strong?  How come the basement door was open, when it never is?  7:02, 7:02, 7:02, 7:02 almost 7:03.  Here is an outlier, 607 feet, you can discard that one if you want.  7:12, within [thirty-nine] feet, safe to say I suggest back out in the street at that point . . . "

Later, the prosecutor stated, "here is an outlier with [a] 115-foot range, other than that everything is green . . . ," again

12

highlighting a discrepancy.  We interpret the prosecutor's comments asking the jury to "discard" certain data points as permissible based on Calcagni's testimony that some data points are more accurate because they are based on stronger satellite signals.  We discern no error, and therefore no substantial risk of miscarriage of justice.

<u>Judgments affirmed</u>.

By the Court (Massing, Singh & Grant, JJ.[3]),

Clerk

Entered:  July 9, 2026.

---

[3] The panelists are listed in order of seniority.